Good morning, your honors. May it please the court. My name is Keith Swisher and I represent Tymond Preston in this direct appeal. I would like to try to reserve a few minutes for rebuttal and I'll try to mine the clock toward that end. As an overview of what I'd be talking about today, I heard that the first case involved one issue and no one can accuse me of raising only one issue in this appeal. I would like rather to talk about the snake eyes of my confession that should have been suppressed and issue five regarding sentencing. And when I get to issue five, I received a kind call from the government last night and it turns out we actually do agree a bit on issue five, particularly with respect to the plethysmograph testing condition. And of course, obviously, although I'll be talking about issues one and five, I'm here for you and if you of course have any questions regarding other issues, please fire away. With respect to issue one, this case involves a coerced confession from a mentally impaired youth and therefore the district court should have suppressed that vital confession. I recognize that the case law tells us that I have to establish that there were coercive techniques used such that they were calculated to overbear and in fact did overbear the defendant's, Mr. Preston's, will. And let me tell you why that happened in this case. First of all, the two agents who approached Mr. Preston set the stage for what they were trying, the answers they were trying to extract from him. They said 16 times that there was an event that occurred on Thursday or Friday when the actual alleged event ended up occurring on Wednesday, if it did indeed occur. And that they were also later on investigating sexual abuse. They then turned over the course of the interview turned interrogation to promises of leniency and an interesting sort of twist in this case, a promise of confidentiality. And by that I mean they told Mr. Preston, look, if you cooperate with us, if you tell us what's going on, we do this all the time, it stays with us, it stays with the U.S. Attorney's Office, it stays in the folder, and it goes no further. And that's it. Also, they created the impression for Mr. Preston that if he cooperated, it would reduce the consequences to him. And both Judge Snow, ERs 97 and 42 through 43, and the agents admitted that they created that impression. And I made a brief unfortunate omission in my reply brief. I sealed ER rather than just plain ER. 21 through 25 and 31 through 32. And therein you'll find that the agents actually admitted that they, reluctantly, that they created this atmosphere in which if he cooperated, then it would reduce the consequences, but if he didn't, they were going to take it to the U.S. Attorney's Office. They then moved to threats. If failing to get what we're here for. They exaggerated and lied about the evidence. They mentioned a couple times that forensics had confirmed at that point that something had happened when in fact it did not, and that eight people witnessed Mr. Preston. They used leaded and loading questions, just to go along with the record, it's fairly frank, that did your penis go in all the way or just a little bit? Are you a one-time molester or are you a one-time experimenter or are you a serial predator? It's similar in line to the classic question of did you stop beating your spouse in May or April of last year? And then they also told him about they'd have to go and question all the children. It's something of that sort. They certainly said, Your Honor, Judge Ferris. But what I'm wondering about, let's say all those things happened, how do we get to coerced confession? Sure, Your Honor. The fact of the matter is all of those things are adding up to overbear his will. It would be, it's not a situation in which we can isolate one particular technique. For instance, I'll give you one, the technique where they lie or exaggerate about the evidence. The government has numerous cases that show that that would be appropriate in isolation. But the test is the totality of the circumstances, four of which I've just listed. In addition, they suggested all of the facts to him, condom use, etc. And they just broke him, Your Honors. They rejected his explanation 50 times before he actually agreed passively with their questions. This is all in his driveway. Right, that's true, Your Honor. So they haven't taken him any to his house. True, yes. And he knows he's free to leave at any time. He knows he doesn't have to talk to them. I would agree that he's certainly in front of his house. I'm not sure that he knows that he's free to go at any time. Some of that is not on the tape recording. To the agent's credit, they recorded the conversation, which is one of the reasons why I'm able to identify all of these coercive techniques that lead to both true and false confessions alike. Some of what they said where you're free to go and such is not on the record, or not in the tape recording, I should say. So it's unclear to me whether he was free to go. There's also that somewhat ambiguous part of the record where they said, would you like to go in the car and talk about it? Which admittedly can be interpreted two ways, but one clear way is that if we don't start getting some answers out of you, we're going in the car. And it certainly didn't seem they let up. In fact, they continued the pressure. As was noted in the record, it was sort of a crescendo. So I just don't agree with the part of your question that he was free to leave, or more importantly, that he felt that he was free to leave. In addition to the 50 times that I was mentioning Judge Bybee, he admitted to the wrong date. So that's evidence that they overcame his will. He changed nothing on the apology. He was basically just agreeing or passively sort of submitting to them at that point. So they keep coming back, as you noted. And then importantly, this is where I'll end, is they told the prosecutor that if you fail to cooperate, we're going to, they told Mr. Preston, I'm sorry, if you fail to cooperate, I'm going to tell the prosecutor. If you cooperate, on the other hand, it just goes with us. It goes in the file. It goes no further. And some of all those factors in the totality is I would say that Mr. Preston has shown on this record that he's met the threshold, which I need to meet to go on to the next part, is that his characteristics. And the government on this one doesn't put quite as much in its briefs on this. And I think because it recognized we have a defendant here, IQ of 65, Atkins and other cases note that that's in the range for mental retardation. He has gross deficiencies in cognitive abilities and language comprehension, which was particularly unfortunate because the way this confession was extracted was from two fairly sophisticated Judges. No. Had the opportunity of, of, um, of talking with Mr. Preston, didn't he? Uh, in certainly saw him at the, at the sentencing colloquy. That's true. Yes. So he, he has, he has seen this witness in ways that we have not. Uh, that's true. Your honor. Although I would note the timing though, of this, the sentencing colloquy that judge, judge snow and made up his mind as to suppression before that this case went to trial. Did Mr. Preston testify at trial? No, he did not. All right. But there would have been pretrial other opportunities when judge snow would have, would have had an opportunity to talk with Mr. Preston. Uh, that's true. Although they were fairly fleeting yes and no's types of, and there were things that Mr. Preston decided to waive that judge snow asked him about and asked, and asked Mr. Preston directly about, and he exhibited some confusion about what it meant if you had a, if you had a divided jury, for example, but he was also quite clear that he knew that he was, that he knew and answered, uh, appeared to answer promptly that he knew that there were 12 jurors who were responsible for trying him. Um, I, judge baby, I agree to some extent that he was not completely non-responsive. I think as you noted, there was a lot of confusion reflected on the record and there was a lot of coaching both, um, by defense counsel and judge snow was asked whether he had any doubts as to whether Mr. Preston was able to waive anything. And I think his answer was absolutely not. Um, there, there is that part of the record, your honor. There was also the part though, where count, are you referring to defense counsel, trial counsel? Yeah. There's also the part of the record where he, he's expressed numerous times that, that the deficiencies that Mr. Preston labors under. But he didn't, but he didn't, he didn't seem to have any concerns about whether Mr. Preston was able to aid him in his defense, that there was no reason that he didn't interpose his impaired mental state either as an absolute defense to the crime or as a defense to being tried. That is that he was not competent to be tried because he couldn't aid his counsel in his own defense. Uh, that's true, your honor. Um, uh, rule 11, uh, was, was, um, uh, proceedings were explored and, uh, Mr. Preston was, uh, by one doctor was determined to be, um, you know, borderline and then go forward. I read the, I read the transcripts, um, for both the, uh, the victim and the, um, the trial transcripts, the, the victim's interview, the Mr. Preston's interview with the police. You know, it's very difficult on a cold record to, to tell what's going on and how quick the responses are and whether there's stuttering or incoherence and so on. But his answers, his answers appear on this cold record to be reasonably comprehensible. Judge, his answers in what context? Well, his answers, his answers to the police, to the, um, to the investigators questions to him appear to be reasonably coherent. He has, uh, he has an expansive vocabulary, including lots of bad language. Um, he's able to talk, um, about, uh, his, his neighbors. He's able to answer questions. Um, he has, uh, he's able to use, you know, substantial words, uh, in answering questions about what he did or didn't do to the victim. So, again, on a cold record, I, I, I admit that there's plenty here that we could be missing, but you're asking us to review, to overturn this on a cold record, uh, when the district court saw, saw Mr. Preston on a regular basis. True, Your Honor, I just add, you also have the audio recording of the actual interrogation here. Um, and, and I would just note that there were a lot of one word sort of grunt answers. I don't know. I wasn't there. And in fact, he wasn't there on Thursday or Friday. Sounds like all the teenagers I know. He, he, he in fact wasn't there on Thursday or Friday. As, as you, you may know, um, uh, people, uh, around his, um, functioning, they, they rely on routines. They're important to him. One of his routines is that on Friday, every week, he'd go to his cousin's house to the flea market and would spend the night. So he was quite clear on that point that he wasn't there. Um, and just in, in, in closing on this issue, um, Your Honor, that the, the agents knew about almost all of his characteristics. They knew he was young, that he didn't understand what the word disabled meant, and then he said that I'm disabled. He said, I'm not all there. Sometimes I go crazy. And even in their own report that was generated after this, they noted that he dropped out at the 10th grade. Um, so a lot of his vulnerabilities, such that it was easier to overcome his will than say one of ours, um, is, is, the agents knew about it and it's in the record. And so I would ask, um, Your Honor, that you, um, please, uh, uh, reverse the district court because that, um, that admission, that, uh, confession should have been suppressed. If, uh, if it pleases the court, I'll turn to my last issue, which is issue five. Um, here we've got four sub-issues. We have an, a too long and unreasonable term of supervised release, the longest possible of life. We have three additional. We have the plethysmograph testing, the, uh, banning him for life for, from inappropriate materials, and finally, banning him for life from being in the company of minors. With respect to the, the first point, the lifetime duration, um, the judge mentioned in passing on the record only deterrence in protecting the public in relation to the, the duration of this, um, lifetime, uh, condition of supervised release. Um, and what I would submit is happening contrary to Cardi, Gall, and Rita. So what's happening in these cases is that there's a presumption of reasonableness imposed to the sent, the condition of life supervised release. Um, cause if you look about it, and I'm, and this is a very serious offense if it deed, indeed incurs, I'm not implying otherwise, but of the category of sexual abuse with a minor, it's, it's on the relatively low end of the spectrum because you have the 18-year-old mentally impaired offender. Um, this was one time, and he had multiple opportunities with these children. They were in his house all the time that it, regularly it was in the record, and that there's no, there was no physical signs of abuse. Obviously if it occurred there would be significant mental, um, harm and otherwise, but there's no bruising, tearing, um, etc. And so I would say that it's both procedurally, the, the reasons that were listed for that, the longest possible length of supervised release are just not there, so it's procedurally unreasonable. It's unreasonable because we're making a presumption of unreasonableness, which is a misinterpretation of the precedent and guidelines. Counsel, you mentioned that, that the, uh, that Arizona has, uh, has apparently had some contact with you, or the government has, I'm sorry, the United States, and that they may agree that some of these terms are, are over broad. Absolutely, excellent, excellent timing, uh, perfect. That, my issue, so in, in sum, that it's both substantively and procedurally unreasonable. The, with respect to the placismo graph, which is where we now agree on, um, on this record, um, correct me if I'm wrong, Mr. Morrissey, but that, um, the government doesn't think that, that that condition, which of course is very intrusive both mentally and physically on, on the genitals of the body, um, is unsupported by this record and for that reason a remand is needed. You know, you know what else that you, you might want to touch upon? Let's assume that the court agrees that life is a long time for an 18 year old person and maybe there's something wrong with it, but when you look at this record, is there any reason that the person who is doing the sentencing could conclude that your client was not at all aware of the consequences of his acts upon the victim and the consequences to the victim of the acts that he did? I, I see. And then, and then as that relates to the seriousness of the offense and therefore the length of the resulting, um, you see he's, he's, he's, he's clearly developmentally delayed is the term I gather people prefer to use. He clearly is developmentally delayed and on this record, couldn't the sentence have concluded that he simply is not aware of the effects of his conduct on his victim? Uh, I, I, I think I would agree, your honor, that there would be, um, in light of his, as you mentioned, delay, um, and the fact that, uh, the conditions in which he was raised and the fact that he was out of school. And the things he said, the things he said about the, about what happened. He, he makes it such a big deal. He, uh, it was only a few minutes, he was crying, he was doing, he's, he, he indicates that he's not aware that there are consequences to his victim. And the, and the person sentencing could, could conceivably, and you tell me why this is wrong, say here is a person who's committing acts, but we know we're, we're looking at one boy with one, one allegation. That's what this boy is doing. And he's developmentally late and he'll never know. So we're going to make it light. Interesting. Um, I, I would agree that there's some evidence of that in the record. I just, for the life to be the longest at 18, um, without any type of assessment. But how do we get around the fact that this record suggests one, he doesn't realize what he's doing and because he's developmentally late, he's incapable of ever realizing what he's doing. I, well, I think what would you put as an or if you wanted to say life is too long, should it be life or, and then what would I would say, I would say three to five years, your honor, there'll be plenty of conditions about three to five years on this record. Oh sure. Well, in a number of the cases in which these types of links were upheld, um, it's in three to five years of supervised, um, release rather than life. But we've got a different person. The sentencing has to do with who is being sentenced. That's true. The person who's being sentenced this time is Mr. Preston and with all of his characteristics. Absolutely. Three to five years. Well, nothing will be magic on that three to five years on this record. One could conclude that he'll be just about the same as he is now. Well, but he'll have five years, um, locked away and he'll also have a bunch of different types of evaluation, some of which we haven't challenged in here. Um, and I would just say that he deserves a chance of something less than lifetime government supervision. But I thought you might be able to tell, say it was life or until such time as, and then I don't know what you'd fill in the blank with. If he's, if he's, if he's able to know what he's doing is, has serious consequences on his victim, then maybe life is too long. But if he doesn't and he's retarded, well, retarded, I know is not the right words, developmental delayed, then what do we do when we review it? But in three, five or 10 years, these problems would re-manifest themselves. And so I would submit that, that a link, a term of years of that length would, would, um, would show the, uh, probation office and the court whether or not Mr. Preston has actually taken that behavior to society. Um, judge, by the way, I know I've overstepped my time. Am I permitted a minute of rebuttal? I will give you, I'm going to allow you a minute. Oh, thank you very much. Good morning. I'm Michael Morrissey from the District of Arizona. Let me start with the concession that the government has, uh, come to, which is that, um, as the government notes in its brief, the district court with respect to the plethysmograph condition did not make explicit findings. Um, the government believes that on this record, it, that cannot be sustained on this appeal and that a remand is appropriate on an open, uh, record. Um, the government would also note that it will not be seeking the plethysmograph condition. However, um, to the extent that the probation office and the court itself find it, uh, useful to conduct that inquiry, they can, uh, the district court can, can follow the instruction and teachings of Weber and cope and, uh, conduct that, uh, on a proper evidentiary record. Um, what about the other, what about the other terms in sentencing? Do those need to be reexamined by the district court, lifetime ban and the company of minors inappropriate acts? Let me, let me try to take those a little bit in order. I think, um, judge that the lifetime supervised release is actually well supported in the record. And I would, um, refer the court to ER two 20 and two 21 in that area. And, and that's where the district court makes explicitly the argument that judge Ferris just raised, which is, um, you had a very young victim here. Um, and you also had a relatively young perpetrator, an 18 year old. And what the district court specifically raised was his concern that this defendant simply can't get along with people and, and needs help appreciating wrongfulness of his acts. One thing that he discussed with defense counsel at sentencing was the defendant had, um, not made it in a halfway house while in custody had been redesignated from medium to high security for fighting disciplinary violations for simply being unable to get along with people. Um, the court was concerned about the aggression contained in defendant. Um, and the court itself said, I'm not completely sure whether this manifests itself, um, always with respect to sexual offenses. Um, on this record where you do have a very young victim, where you do have, um, concern for future victims, where you do have a serious offense and where the defendant was given a greatly mitigated sentence of 50 months, um, by, by the court, that does show that the district court followed what the defense called the parsimony, uh, principle and did in fact try to find the least restrictive method possible to aid and rehabilitate this defendant, but also to protect the public. Um, the length then of the supervised release was, was not substantively unreasonable and, and was not a plain error by the court. Um, I believe the court also raised the other conditions of, um, contact with sexually explicit material, but the court made specific reference, I believe it's to section 2256, which is an appropriate measure for the defendant to know where he would and would not cross the line with respect to possession of sexually oriented material. This court's case law, particularly Reardon, suggests that, that that is an appropriate handling of that issue. Um, Judge Bybee, was there another aspect of the, I thought there was a reference to inappropriate acts, which seems pretty ambiguous to me. The sentencing transcript while stating very clearly, um, that the defendant could not, um, possess inappropriate material, um, and made specific reference to 2256, it then did go on to say, you shall not possess, view or otherwise use any other material that is sexually stimulating, sexually oriented. We're okay there. And then we probably do have a problem or deemed to be inappropriate by the probation officer. Um, since the government believes that, uh, the government believes that remand is appropriate, the government would also suggest that this court can direct the district court to excise that statement because I, I forget which case it is, but it, but it says that you can't have the defendant find out what the probation officer finds inappropriate by having him violate him of his supervised release. He's got to have fair notice ahead of time. And that sentence, uh, strikes me as potentially running afoul of that. So that would be the government's position on that. It would be appropriate on remand. Mr. Morris, of course, you've been asked only about the sentence and you're reasonably comfortable making concessions, but I'd like to get you back to the crime. Um, and I'd like to start with asking you about the, uh, statements of the boy who was the accuser. I believe the trial court said that that was imaginary, but most of the statements were imaginary. Well, the court said that the defense, the victims, I'm sorry, the victim's statement was minimally probative. Um. Well, now let's stop for a moment there. Were there not a number of incredible statements? Yes, Judge, there were. He said that Preston drove a truck off a cliff. Isn't that true? He, he did. He talked about a monster truck, monster truck. There's a hell, there are helicopters, uh, and a police chase and helicopters. Um, in the, in the victim's statement, there is the, uh, defendant jumping off a shed, I believe, and breaking his leg. Um, there, there is no dispute that portions of the victim's statement could not, uh, or could not have occurred as stated by the victim. Um. I would prefer to call him the accuser, but if you want to call him the victim, that's all right. But, somebody who is obviously fantasizing is spinning a narrative. How can you believe anything he says? Well, um, because it is heavily corroborated. Well, now, let's, so it's going to depend on the corroboration. But how can, you've got a fantasist spinning a tale, and you say, well, if something in that is corroborated, that's okay. That's proof. Judge, that is not my argument. Okay. I understand the court's question, and if I could speak just to a bit, I believe I've been fair in representing that the victim made statements that are, uh, as the court says, fantastical. That does not mean, and the district court itself found, that each and every statement that the victim made was fantastical. And this court does have the transcript of the victim's statement. And you'll notice, as, as the court reviews it, one matter that the victim is consistent about is that the defendant put his penis in the victim's butt. And he says that repeatedly. And then he would go off and, and tell other stories. There was testimony into the record by, uh, Carla Monsher as, as to why that might occur. But I would urge the court to also consider the consistency of the victim's statement as to what was done to him by this defendant. And so I don't believe you would, as the district court, did not throw out the entirety of the statement. I find it hard to believe that in any other kind of case, the government's principal witness would be shown to live in fantasy land, and yet the government would put him forward as a believable witness. Judge, he's a very young boy. He does not completely live in fantasy land. And the district court, who was in a very good position to judge these matters, also heard from the defendant's statement. And the defendant's statement has fantastical aspects, too. He has a non-existent tumor that he's suffering from. According to the defendant, he has witchcraft and other aspects that have paralyzed his father. That, um, both counsel referred to the difficulty of these circumstances and this trial. And that was something that the district court was particularly well-suited to sift through and resolve the credibility. And the district court, certainly on any factual findings, did not commit clear error in finding that it was credible, that the defendant's statement was credible, which did track with a crucial detail with the victim's statement, and that it was corroborated by the DNA. Now, let's turn to that. What's the corroboration in the DNA? That the, uh, the, essentially the exclusion principle, Your Honor, that the contributor to the DNA, the contributors to the DNA sample in the victim's underwear, that you could not exclude the victim and the defendant, um, while you could exclude everybody else who was, uh, a relative, who was present, uh, in that time frame, who was living, um, at the house or in the area at the time. These houses are only separated by 50 yards, uh, as the grandmother testified at ER, ER 2479. So there was an appropriate testing of a range of people, and the fact is that, um, 99.8%, uh, percent of the population could be excluded as the contributor of that DNA, while the victim and the defendant, um, could not. And then there was an unknown who could have contributed. Um, according to the defense, uh, the government does not accept that argument and notes that, um, the only person present at all five unexplained alleles, as the court pointed out, is the defendant. So the, uh, the DNA evidence was used appropriately by the court, um, and the court was proper to find it as corroborating. Um, if, if I could turn to the circumstances of the statement made by the defendant, uh, to law enforcement, um, counsel has raised, um, an issue as to whether or not the, uh, defendant was told that he was free to go. At ER 95, um, the, it's clear that the agents advised the defendant he was not under arrest. He was free to terminate the interview at any time. He would not be arrested on that phone. The interview was quite short. It was a little less than 40 minutes. And that is a timeframe that this court has found, uh, relevant in, in other circumstances in trying to determine whether or not the district court erred in finding that the defendant's will was not overborn. Um, I would note also in terms of whether or not, um, the agents used certain techniques, um, uh, alleged by the defense, um, the, the agents said multiple times, we're trying to determine if something happened or if something did not happen. They were not conclusive that, that it must have happened. They said, a number of times they gave alternatives that were equally guilty. Did you do it once or did you do it 100 times? They did. Um, that is, that is true. They also told him if nothing happened, that's cool. Um, law enforcement is permitted to investigate and in a non-coercive setting outside of his house, in the presence of other people where defendant is exercising choices, um, he chose to speak to them. He chose not to speak to them to the, in the car, even when they got to sensitive matters. Um, the defendant had a story he wanted to tell, which he started with, um, that thing with the victim. They're saying, I did that stuff. Um, he, he had a point of view that he wanted to present and law enforcement in a non-coercive way went about exploring and probing that story and they were entitled to do that. Um, I would also note that facts from the defendant's statement did not come from law enforcement. They did give him a choice. Did you use a condom or not? Do you want to apologize or not? That's a very relevant portion of the transcript because there was no forcing, no scripting. The court reviews that. It's very clear that the defendant makes the choice. Yes, I do want to apologize. But, um, getting back to facts, only the defendant supplied only the defendant supplied that the victim afterwards, according to the defendant, initially laughed, then cried and then ran away saying he was going to tell, um, that solely came from the defendant as did, um, what, how he threw away and got rid of the condom. Um, there were many factors that were not supplied by law enforcement. I, I do need to note, and the government agrees that this individual has linguistic difficulties. Um, his primary language is English. Um, he functions, uh, in the, according to Dr. Katie, um, he has ordinary cognitive operations within normal limits. He reads simple and complex words without difficulty. He does have to slow down for longer sentences, but, but we all do. And the district court took that into account in finding that, uh, the defendant's will was not overborne. I see that I'm out of time if there are no further questions. Okay. Thank you, counsel. Mr. Swisher. Thank you, your honor. Um, just, uh, briefly, we, we are so close it sounds like on the, the, the three conditions of supervised release. The, the only one that I'll just mention in passing is in the company of minors. Um, if I would just refer you to the government, um, kindly filed a 28J brief in the Wolfchild case that came out two weeks ago, the same, same condition was a play there, uh, well, similar language. And here it's just sort of a flip side. Um, Mr. Preston can't have children because he couldn't be in the company of minors. He also think of all the people with whom he can't really associate too much because they have children. So he can't go to their house, uh, churches, et cetera. It could even internally conflict with some of the other conditions. He's required to get a GED. Let's hope that no one's 16 or 17 is trying to get a GED as well if it's a, if it's a in-person program. And then a couple of just other, uh, comments with respect to, um, what was mentioned. It's a minor point, but sorry that the, the thing about the tumor I don't think is reflected in the record. He said, like a tumor. And I think for his generation, like a tumor means sort of analogous to, I don't know what's going on in my head. And I think the record confirms that. I don't think he lied to them about a tumor. And there is stuff in the record, items in the record that he was hospitalized numerous times and, and they were trying to figure out what was going on with him through, uh, studies and such. What in your view should be this court's bottom line? I think the government has acknowledged that the case should be remanded. What should be the bottom line of the decision? Absolutely. Judge Ferris, great question. Um, first I think that the conviction should be reversed on the basis of the coerced, um, confession in light of this vulnerable defendant and the techniques that we've been talking about. Um, and this should have been suppressed. Alternative, well, with, if, if that does not occur, then the sentencing very clearly, um, I think that the lifetime and for this defendant and on this record is procedurally and substantially unreasonable. And then the three conditions, which we mostly agree on should be remanded. I would just go one step further and say that on this record, um, I don't think any of the three conditions need to be, uh, I don't think in the interest of judicial economy, we need to have another hearing about this. I think that this court and Wolfchild did it, can say on this unsupported and unsupportable, um, record, you, we're ordering you not to reimpose these conditions. And I think that should be the bottom lines in terms of the, uh, sentencing conditions. Are there any further questions? Your honors? Doesn't appear so. Thank you very much. Thank you very much. We thank both counsel for the argument.
judges: Farris, Noonan, Bybee